UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**24-60186-CR-LEIBOWITZ/AUGUSTIN-BIRCH**

Case No. _____

21 U.S.C. § 846
21 U.S.C. § 841(a)(1)
21 U.S.C. § 853

FILED BY ____MP____ D.C.

Sep 20, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNITED STATES OF AMERICA**

**vs.**

**JOSHUA WEINSTEIN,**

   **Defendant.**
_____/

## INFORMATION

The United States Attorney charges:

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance, "except as authorized" under Title 21, United States Code.

2. The Drug Enforcement Administration ("DEA") enforced the CSA and its implementing regulations by, among other things, approving registrations for manufacturers and distributors of controlled substances. A DEA registration authorized transactions within the legitimate distribution chain. Manufacturers, distributors, or other individuals registering with the DEA were referred to as "registrants."

3. The DEA performed its distributor-related oversight functions by conducting audits and inspections, reviewing sales data and suspicious order reports, and bringing enforcement

actions against registrants that failed to comply with the CSA. A distributor was not authorized under the CSA to distribute or dispense controlled substances unless it maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, research, or industrial channels." *E.g.*, 21 U.S.C. § 823(b)(1); *see also* 21 C.F.R. § 1301.71(a).

4. In addition, the Attorney General's implementing regulations under the CSA required each distributor to design and operate a system to identify suspicious orders of controlled substances, and to report suspicious orders to DEA. *See* 21 C.F.R. § 1301.74(b). Suspicious orders included "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

5. The CSA assigned controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision. Any registrant that received controlled substances with the highest potential of abuse out of the drugs with currently accepted medical uses in treatment in the United States—i.e., those assigned to Schedule II—had to issue a DEA Form 222 to the registrant supplying the drugs. 21 U.S.C. § 828.

6. It was unlawful for any person to use a DEA Form 222 to obtain "controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research." *Id.* § 828(e). Conversely, it was unlawful for a registrant to distribute a Schedule II controlled substance to any person who the registrant knew or intended was obtaining the controlled substance for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the

person's professional practice or research in the course of his legitimate business. *See* 21 U.S.C. § 843(a)(1).

7. Just as distributors could sell controlled substances to one another, and to pharmacies, when authorized to do so by law, an appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a doctor or other practitioner acting in the usual course of professional practice. 21 C.F.R. §§ 1306.04, 1306.06.

8. The Texas Administrative Code required that a "pharmacist shall make every reasonable effort to prevent inappropriate dispensing due to fraudulent, forged, invalid, or medically inappropriate prescriptions in violation of a pharmacist's corresponding responsibility." 22 Tex. Admin. Code § 291.29.

### The Greater Houston Area

9. The greater Houston area ("the Houston area") included the following counties in the State of Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

10. The Houston area was a nationally recognized "hot zone" for pill-mill clinics and pharmacies involved in diverting certain controlled substances onto the black market.

### The Commonly Abused Prescription Drugs

11. The following controlled substances in Schedule II were most often diverted onto the Houston area's black market:

   a. Hydrocodone was an opioid classified as a Schedule II controlled substance. Hydrocodone was a narcotic analgesic used to treat moderate to moderately severe pain and, like other opioids, was among the most addictive drugs used in medicine. The highest-strength quick-release hydrocodone pill commercially available—and the one most in demand on the Houston area's black market—contained 10 mg of hydrocodone bitartrate and 325 mg of the non-narcotic analgesic acetaminophen.

3

Hydrocodone 10-325 mg combination pills typically had a Houston area street value of around $1 per milligram of hydrocodone.

b. Oxycodone was an opioid classified as a Schedule II controlled substance. Oxycodone was a more powerful narcotic painkiller than hydrocodone, having twice hydrocodone's potency per milligram. The highest-strength short-acting oxycodone pill commercially available—and the one most in-demand on the Houston area's black market—contained 30 mg of oxycodone hydrochloride. The oxycodone combination pill containing 10 mg of oxycodone hydrochloride and 325 mg of acetaminophen was high in demand on Houston area's black market. The street value of oxycodone's 30 mg and 10-325 mg pills was approximately $1 per milligram.

c. Hydromorphone was an opioid classified as a Schedule II controlled substance. Hydromorphone was a more powerful narcotic painkiller than oxycodone, typically prescribed when other medication was unsuccessful. The highest-strength short-acting hydromorphone pill commercially available—and the one most in-demand on the Houston area's black market—contained 8 mg of hydromorphone hydrochloride. The street value of hydromorphone 8 mg pills was at least $1 per milligram.

(Collectively, the Schedule II opioids in the strengths described are the "Commonly Abused Opioids.")

12. In addition to the Commonly Abused Opioids, the following controlled substances were also frequently diverted onto the Houston area's black market:

a. Carisoprodol was a Schedule IV controlled substance classified as a muscle relaxant. The highest-strength carisoprodol pill commercially available—and the one most in-demand on the Houston area's black market—was the 350 mg pill. Carisoprodol 350 mg typically sold on the street for $5 dollars or more per pill.

b. Alprazolam was a Schedule IV controlled substance used to treat anxiety. The highest-strength alprazolam pill commercially available—and the one most in-demand on the Houston area's black market—was the 2 mg pill. The street value of alprazolam 2 mg pills was typically $5 or more.

c. Promethazine with codeine was a Schedule V controlled substance classified as a cough suppressant. The street value of a pint of promethazine with codeine syrup was $1,000 or more.

(Collectively, carisoprodol, alprazolam, and promethazine with codeine are "Potentiators," so-called for their reputation on the black market of enhancing the high from the Commonly Abused

4

Opioids.) (Together, the Commonly Abused Opioids and Potentiators are the "Commonly Abused Prescription Drugs.")

### Diversion of Commonly Abused Prescription Drugs onto the Houston Area's Black Market

13. One way that Commonly Abused Prescription Drugs were "diverted"—funneled onto the Houston area's black market—was through pill-mill pharmacies, which typically serviced only customers seeking to pay cash to acquire Commonly Abused Prescription Drugs for non-medical purposes. These pharmacies deployed different schemes designed to provide them access to some of the black-market profit generated by the Commonly Abused Prescription Drugs, while also helping the pharmacies to evade detection by law enforcement:

   a. The "traditional" pill mill required individuals posing as patients to show up, in person, to receive illegitimate prescriptions from complicit doctors and then travel to complicit pharmacies to fill them.

   b. "Counterfeit-prescription" operations typically involved drug trafficking organizations forging prescriptions and identification cards, bringing them to a complicit pharmacy in bulk, and paying large sums of cash for batches of the drugs.

   c. "Back door" operations—known to law enforcement as "ghosting" pharmacies—dispensed with doctors, patients, and prescriptions altogether, relying on established relationships with complicit distributors and their representatives to order as many of the Commonly Abused Prescription Drugs as possible and sell the drugs in bulk, directly to drug traffickers, before shuttering the pharmacy and repeating the process with one or several more.

14. Houston area pill-mill pharmacies often exhibited numerous "red flags" of diversion well-known throughout the pharmaceutical industry, which were also enumerated by the Texas State Board of Pharmacy ("TSBP") in *Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF....*, which TSBP regularly distributed to licensed pharmacies. These red flags included:

   a. filling a reasonably discernible <u>pattern of substantially identical prescriptions</u> for the same controlled substances or combinations of controlled substances;

5

  b. routinely filling <u>prescriptions for known drugs of abuse, alone or in combination,</u> including opioids, benzodiazepines (like alprazolam), and muscle relaxants;

  c. routinely filling prescriptions for the <u>highest strength</u> and/or for <u>large quantities</u> of these drugs;

  d. charging <u>above-market rates</u> and accepting <u>mostly/only cash or credit (instead of insurance)</u> for known drugs of abuse; and

  e. routinely ordering controlled substances from <u>more than one drug supplier.</u>

15. Houston area pill mills commonly procured Commonly Abused Prescription Drugs from a collection of out-of-state "secondary" distributors—small-to-mid-size distributors that charged the pharmacies substantially over-market prices for the drugs. The pill-mill pharmacies readily paid the premium, because they still made large profits selling the drugs onto the black market for hundreds or even thousands of dollars in cash per bottle.

16. The secondary distributors typically implemented ordering restrictions like "caps" (limiting the number of Commonly Abused Prescription Drugs that a pharmacy could purchase per month) and "ratios" (requiring Houston area pharmacies to purchase a set number of non-controlled pills for every Commonly Abused Prescription Drug pill—even if the pharmacies purchased the same cheap generics, month after month, to meet the distributor's ratio requirement). The secondary distributors also typically documented perfunctory "due diligence," including questionnaires completed by the pharmacies or reports from third-party onsite inspections. These measures were not effective in preventing Houston area pill mills from obtaining the Commonly Abused Prescription Drugs from the secondary wholesalers.

17. The secondary distributors often adopted price lists, customer lists, and purported compliance measures for selling Commonly Abused Prescription Drugs to Houston area pharmacies from industry middlemen ("brokers") with established books of Houston area pharmacy business. The brokers were free agents—independent contractors who often represented

several secondary distributors at once. They knew which colors or brands of Commonly Abused Pharmaceutical Drugs the Houston area pharmacies preferred—for example, the blue-colored oxycodone 30 mg that gave that Commonly Abused Opioid pill its street name, the "blues." These preferences were not based on any legitimate medical purpose, but rather on street demand. In exchange for the access and profits the brokers provided, the secondary distributors paid the brokers sizeable commissions on the sales they facilitated.

## **DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS**

18. Defendant **JOSHUA WEINSTEIN** resided in the Southern District of Florida and held the title of President at Wholesaler C, a secondary distributor with its principal place of business in Miami, Florida, and its primary warehouse in North Carolina. Wholesaler C was owned by Person A and Person B, who through in or around 2022 ultimately approved Wholesaler C's Houston area pharmacy customers' applications to purchase and purchasing limits.

19. Chad Atkinson was a broker who resided in Lumberton, North Carolina. Atkinson helped Houston area pill-mill pharmacies buy Commonly Abused Prescription Drugs from willing secondary distributors, first as an independent contractor for Proven Rx Sales LLC ("Proven"), a purported pharmaceutical consulting company in Miami, Florida; and later, beginning in around 2017, directly as a sales representative for Wholesaler C.

20. Creative Care was a "traditional" Houston area pill-mill pharmacy owned and operated by pharmacist-in-charge ("PIC") Keisha Harris. **JOSHUA WEINSTEIN** handled the Creative Care account for Wholesaler C. The pharmacy shuttered when Harris was arrested for dispensing Commonly Abused Prescription Drugs without any legitimate medical purpose.

## WHOLESALER C'S SALES OF COMMONLY ABUSED PRESCRIPTION DRUGS TO HOUSTON AREA PILL-MILL PHARMACIES

21.	In around 2017, Atkinson brought to Wholesaler C Proven's business model for selling Commonly Abused Prescription Drugs to Houston area independent pharmacies: essentially, selling the Commonly Abused Prescription Drugs at a large markup, while capping the pharmacy customers' monthly purchasing allocations; requiring the pharmacies to purchase non-controlled substances in a 4:1 ratio against the Commonly Abused Prescription Drugs the pharmacies purchased; and implementing purported compliance measures that mostly facilitated, instead of prevented, diversion.

22.	For a brief period, Atkinson facilitated sales to Houston area pharmacies for both Wholesaler C and Proven. In 2018, when Proven's owner discovered that Atkinson was sourcing Commonly Abused Prescription Drugs from Wholesaler C to Proven's Houston-area pharmacies, Proven issued cease-and-desist letters to both Atkinson and Wholesaler C. But by that time, Wholesaler C had already discovered the large Houston area profit margins and Proven's model for exploiting them. An agreement was reached that allowed Atkinson to keep certain Proven customers with Wholesaler C, and that also allowed Proven to use Wholesaler C as a source of supply for Proven's customers with larger demands for the Commonly Abused Prescription Drugs than Proven's other secondary distributors would provide.

23.	After Atkinson's arrival, prices were established for Commonly Abused Prescription Drugs that Wholesaler C would offer pharmacies in the Houston area, and the following practices were established for those customers:

   a. Person B, assisted by Wholesaler C employee Person C, would review and approve applications to purchase controlled drugs;

   b. Houston area pharmacies would be required to purchase four non-controlled pills for every Commonly Abused Prescription Drug pill;

8

  c. Person B, assisted by Person C, would set limits on the number of Commonly Abused Prescription Drugs each Houston pharmacy could buy per month; and

  d. The Houston area pharmacy customers' purchasing limits and ratio requirements would be conveyed to them by Atkinson and/or other Wholesale C representatives.

24. Wholesaler C approved most Houston area pharmacy applications to purchase Commonly Abused Prescription Drugs, even though:

  a. The Houston area pharmacies commonly failed to complete portions of Wholesaler C's approximately 4-page "regulatory questionnaire";

  b. The Houston area pharmacies commonly reported in drug-usage reports ("DURs") they submitted with their applications that they dispensed few or even no controlled drugs other than the Commonly Abused Prescription Drugs;

  c. The Houston area pharmacies commonly reported in their application materials that they were already purchasing Commonly Abused Prescription Drugs from several other secondary distributors;

  d. The Houston area pharmacies commonly reported in their application materials that 70% or more of their customers used insurance to pay for prescriptions, even though insurance companies would not cover the prices Wholesaler C charged the pharmacies for the Commonly Abused Prescription Drugs even *before* the pharmacies marked them up further for sale to their customers.

  e. The Houston area pharmacies commonly reported to Wholesaler C that they maintained hours of operation from 9 or 10 a.m. to 3 p.m.; and

  f. The Houston area pharmacies commonly included photographs with their applications to purchase that depicted locations in strip malls, bars on the windows and doors, and/or nothing for sale in the areas accessible to customers—just pick-up and drop-off windows.

25. **JOSHUA WEINSTEIN**, Chad Atkinson, Persons A, B, and C, and others at Wholesaler C were also aware that many of Wholesaler C's Houston area customers had preferences for certain brands and/or colors of Commonly Abused Prescription Drugs—with those customers sometimes going so far as to refuse to purchase the "wrong" ones. For example, in an August 2017 email to Atkinson and the Wholesaler C email account nat.acct@▇▇▇.com, a customer complained that "[y]ou sent me all 4 bottles of OXY 30 mg tab[let]s CAMBER Products. My patients/customers **do not accept** these YELLOW colored tab[let]s. I can not [sic] sell them,

9

and that is why I requested specifically for **A[L]VOGEN** OR MALLINKRODT (emphasis in original)." Alvogen and Mallinckrodt pills were both blue, which was the preferred color on Houston's black market for oxycodone 30 mg. In a June 2018 email from Person B to **WEINSTEIN** and Person C, Person B asked of increasing requests by Houston area pharmacies for limit increases, "has something or someone in the market changed that has impacted their ability to get controls from other sources?" Person C responded, "The reason for the requests is because [**WEINSTEIN**] can get the brand Qualitest **and that is what these pharmacies want** (emphasis added)." The Houston area customers never expressed such preferences for the non-controlled drugs they had to buy to purchase their limits of Commonly Abused Prescription Drugs from Wholesaler C.

26.  Wholesaler C's employees came to understand that the controlled drugs the Houston area pharmacies were interested in purchasing were typically the Commonly Abused Prescription Drugs, and no others. For example, in the December 2020 email excerpted below, when Atkinson asked a Wholesaler C employee generally about controlled-drug "[a]llotments" for a new Houston area pharmacy, the Wholesaler C employee responded specifically about the Commonly Abused Prescription Drugs "[c]arisoprod[o]l [350 mg]," "[a]lprazolam 2 mg]," "[h]ydrocodone [10-325 mg]," and "[o]xycodone [30 mg]":

```
From:           █████████
Sent:           Thursday, December 10, 2020 1:11 PM
To:             █████████ oshua Weinstein; Chad Atkinson
Subject:        New Allotments for █████████


Carisoprodal  5,000
Alprazolam   5,000
Hydrocodone  4,000
Oxycodone    4,000
```

27. The focus on Commonly Abused Prescription Drugs in Wholesaler C's discussions with and about its Houston area pharmacy customers correlated with Wholesaler C's internal assessments of the company's profit margins. One such assessment, for Calendar Year 2021, concluded that Wholesaler C's margins on controlled substances it sold (almost all of which were Commonly Abused Prescription Drugs sold into Houston) were more than ten times what the company made on sales of non-controlled substances:

**2021**

| 2021 (non) | 2021 (ctrl) | Total |
|---|---|---|
| $ 2,228,711.90 | $ 1,121,977.52 | $ 3,350,689.42 |
| $ 1,688,330.22 | $ 225,496.88 | $ 1,913,827.10 |
| $ 540,381.68 | $ 896,480.64 | $ 1,436,862.32 |
| 32% | 398% | 75% |

28. Wholesaler C's overall Schedule II dispensing after Atkinson's arrival also reflected the sales representatives' focus on selling the Commonly Abused Opioids to its Houston area customers. From in or around January 2018 through in or around May 2023, Wholesaler C sold over 7.2 million Schedule II pills, nearly all of them Commonly Abused Opioids—just hydrocodone, oxycodone, and hydromorphone, in just one strength apiece:

Commonly Abused Opioid Pills Wholesaler N Sold to Houston Area Pharmacies, 2017 Through End Q1 2023

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Q1 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| Hydrocodone 10-325 mg | 764,860 | 1,039,100 | 1,073,000 | 1,255,500 | 1,111,400 | 361,400 | 80,200 | 5,685,460 | 79% |
| Oxycodone 30 mg | 5,400 | 135,300 | 176,500 | 393,900 | 512,600 | 228,500 | 84,100 | 1,536,300 | 21% |
| Hydromorphone 8mg | | | | | 2,000 | | | 2,000 | 0% |
| Other | - | - | - | - | 5,480 | 7,400 | 4,700 | 17,580 | 0% |
| Total | 770,260 | 1,174,400 | 1,249,500 | 1,649,400 | 1,631,480 | 597,300 | 169,000 | 7,241,340 | 100% |

11

29. Further, although Wholesaler C was headquartered in Florida and operated distribution centers in Florida, North Carolina, Arizona, Maryland, and Tennessee, Wholesaler C supplied Commonly Abused Opioids almost exclusively to pharmacies located in the Houston area: during that timeframe, greater than 99% of the hydrocodone 10-325 mg and oxycodone 30 mg pills that Wholesaler C distributed to pharmacies anywhere in the United States went to the Houston area. At around $1 per milligram, the street value of the Commonly Abused Opioids Wholesaler C distributed into the Houston area during that timeframe was around $100 million.

30. During the same timeframe, Wholesaler C sold Houston area pharmacies millions of pills of the Potentiator carisoprodol 350 mg, hundreds of thousands of pills of the Potentiator alprazolam 2 mg, and over 1,300 gallons off the Potentiator promethazine with codeine syrup:

Commonly Abused Controlled Substances (Schedule III-V) Wholesaler N Sold to Houston Area Pharmacies
2017 Through End Q1 2023

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Q1 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| Carisoprodol 350 mg pills | 647,000 | 1,063,000 | 643,000 | 843,200 | 864,000 | 387,000 | 64,000 | 4,511,200 | 71% |
| Alprazolam 2 mg pills | 14,500 | 68,000 | 67,000 | 209,000 | 261,000 | 134,000 | 30,500 | 784,000 | 12% |
| Promethazine w/ Codeine Syrup (measured in 5ml Dosage Units) | 3,311 | 51,368 | 34,434 | 256,744 | 486,906 | 136,224 | 45,976 | 1,014,963 | 16% |
| Total | 664,811 | 1,182,368 | 744,434 | 1,308,944 | 1,611,906 | 657,224 | 140,476 | 6,310,163 | 100% |

31. At around $5 per pill, the street value of the Potentiators alprazolam 2 mg and carisoprodol 350 mg that Wholesaler C distributed into the Houston area during that timeframe was around $26.5 million. At around $1,000 per pint, the street value of the Potentiator promethazine with codeine that Wholesaler C distributed into the Houston area during that timeframe was around $10.5 million.

32. In addition, as the profit-margins table from 2021 above shows, Wholesaler C also made a profit on the non-controlled drugs it sold Houston area pharmacies that counted toward Wholesaler C's controlled-to-non-controlled-pill "ratio" requirement. For that purpose, Wholesaler C provided its Houston area pharmacy customers an ordering checklist with a small variety of non-controlled substances, which Atkinson, **JOSHUA WEINSTEIN**, and/or others at Wholesaler C sometimes selected for the Houston area pharmacies. For example, in an August 2020 email to a Wholesaler C employee, Proven representative Cassandra Rivera wrote, "Sorry my dear was at Adventure Island…but its [a particular Houston area pharmacy]…**feel free to put the non[-controlled-pill order] together and lmk [let me know] the total** so they can send check [happy, arms-up, and folded-hands emojis] (emphasis added)." In a March 2021 email, a Wholesaler C employee emailed Atkinson, "Are the drams something you told [Procurement] to order or are those just **fake nons** (emphasis added)?"

## SALES OF COMMONLY ABUSED OPIOIDS TO CREATIVE CARE

33. The following chart reflects the Commonly Abused Prescription Drugs Creative Care purchased through **JOSHUA WEINSTEIN**, from around mid-2019 through around the end of August 2019:

**Commonly Abused Opioids that Creative Care Purchased from Wholesaler C**

|  | Hydrocodone 10-325 mg Pills | Oxycodone 30 mg Pills | Other Schedule II Pills |
|---|---|---|---|
| Creative Care Pharmacy | 110,500 | 10,000 | 0 |

### Creative Care

34. In June 2017, **JOSHUA WEINSTEIN** became Wholesaler C's direct sales representative for Creative Care, the Houston area pharmacy run by Keisha Harris. **WEINSTEIN** quickly became aware of Creative Care's red flags for diversion, including:

13

      a. Creative Care's location in the Houston area "hot zone";

      b. Harris being interested in purchasing as many of the Commonly Abused Prescription Drugs as she could get from Wholesaler C;

      c. Harris's lack of concern for the non-controlled substances Wholesaler C required her to purchase to maximize her purchases of controlled substances;

      d. Harris's interest in brands and colors of the Commonly Abused Prescription Drugs, which legitimate pharmacy customers rarely exhibited; and

      e. Harris's willingness to pay well-over-market rates to acquire both the Commonly Abused Prescription Drugs, and the non-controlled substances required to meet Wholesaler C's ratios—the payment of which Weinstein understood would have been untenable without profits driven by the black market.

35. In spite of those red flags, **JOSHUA WEINSTEIN** helped Keisha Harris increase her purchasing limits for the Commonly Abused Prescription Drugs. In other instances, **WEINSTEIN** picked for Harris the non-controlled substances she needed to purchase to meet Wholesaler C's required controlled-to-non-controlled-substance purchasing ratio. In around February 2018, **WEINSTEIN** sent Harris an email about a price increase for a Houston area preferred brand of the Potentiator carisoprodol 350 mg, offering to "look at another manu[facturer]" but noting that "no one else [in Houston] has switched for whatever reason."

36. Around March 2019, **JOSHUA WEINSTEIN**, Atkinson, and Wholesaler C co-owner Person A, traveled to Houston and visited Creative Care. The pharmacy was in a strip mall; there were metal bars on the outside-facing doors and windows; and there was nothing in the single-room customer area except a few chairs and two small windows for "pick up/drop off" and "consultation."

37. In around late August 2019, **JOSHUA WEINSTEIN**, Person B, Person A, and Chad Atkinson became aware of a press release issued by the U.S. Department of Justice reflecting that Harris, as "pharmacist-in-charge and owner of Creative Care Pharmacy of Houston, Texas," was charged criminally "for her alleged participation in a scheme to unlawfully distribute and

14

dispense controlled substance[s] without a legitimate medical purpose." In early September 2019, **WEINSTEIN** received an email from Harris stating that "I'm sure by now you know that Creative Care is no longer, keep me in your prayers."

38.     **JOSHUA WEINSTEIN** never again directly serviced a Houston area pharmacy account for Wholesaler C—a task typically left to Atkinson.

### Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances
### (21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))

39.     From in or around mid-2017, and continuing through in or around October 2019, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JOSHUA WEINSTEIN,**

did knowingly and willfully combine, conspire, confederate, and agree with Keisha Harris, and with others, known and unknown to the United States Attorney, to distribute and dispense, and to possess with the intent to distribute and dispense, a controlled substance, in a manner that **JOSHUA WEINSTEIN** and his co-conspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that the controlled substances involved in the conspiracy attributable to defendant, and the conduct of other conspirators reasonably foreseeable to him, were mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances.

15

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **JOSHUA WEINSTEIN**, has an interest.

2. Upon conviction of a violation of Title 21, United States Code, Section 846, as alleged in this Information, the defendant shall forfeit to the United States any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such offense, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense, pursuant to Title 21, United States Code, Section 853.

3. The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, a sum that represents the total amount of funds involved in or derived from the alleged offenses and may be sought as a forfeiture money judgment.

4. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 21, United States Code, Section 853.

*[signature]*
MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA


GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*[signature]*
DREW PENNEBAKER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
24-60186-CR-LEBOWITZ/AUGUSTIN-BIRCH

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO.: _____ |
| v. | |
| JOSHUA WEINSTEIN, | **CERTIFICATE OF TRIAL ATTORNEY** |
| _____/ | **Superseding Case Information:** |
| Defendant. | New Defendant(s) (Yes or No) ____ |

**Court Division** (select one)
- ☐ Miami    ☐ Key West    ☐ FTP
- ☒ FTL      ☐ WPB

Number of New Defendants ____
Total number of new counts ____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: _____
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)              (Check only one)
   I    ☒ 0 to 5 days            ☐ Petty
   II   ☐ 6 to 10 days           ☐ Minor
   III  ☐ 11 to 20 days          ☐ Misdemeanor
   IV   ☐ 21 to 60 days          ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

By:    _____/s/ Andrew Pennebaker_____
       ANDREW PENNEBAKER
       DOJ Trial Attorney
       Court ID No.    A5503256

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** _____**JOSHUA WEINSTEIN**_____

**Case No:** _____

Count #:  1

Title 21, United States Code, Section 846_____

Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute,
Controlled Substances
* **Max. Term of Imprisonment:**    20 years
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:**   3 years to life
* **Max. Fine:**   $1 Million

*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><u>    Joshua Weinstein,    </u><br>*Defendant* | )<br>)   Case No.<br>)<br>)   **24-60186-CR-LEBOWITZ/AUGUSTIN-BIRCH**<br>)<br>) |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*